UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



SIGUTE MEILUS and LAURA EKAU TAYLOR,

        Plaintiffs,

   -against-

RESTAURANT OPPORTUNITIES CENTER
UNITED, INC., SEKOU SIBY, and ALICIA RENEE
FARRIS,

        Defendants

No. 21-cv-02554 (CM)

---

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS

McMahon, J:

    Plaintiffs, Sigute Meilus ("Meilus") and Laura Ekau Taylor ("Taylor") bring this action against Defendants, Restaurant Opportunities Center United, Inc. ("ROC"), Sekou Siby ("Siby"), and Alicia Renee Farris ("Farris"). Plaintiffs allege that Defendants violated Title VII of the Civil Rights Act of 1964, §§ 42 U.S.C. 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"). Plaintiff Meilus brings eight (8) causes of action against Defendants for age and gender discrimination and retaliation under Title VII and the NYSHRL. Plaintiff Taylor brings ten (10) causes of action against Defendants for age, gender, and race discrimination and retaliation under Section 1981 and the NYSHRL.

    Defendants move to dismiss the First, Third, and Fourth Causes of Action in Plaintiffs' Second Amended Complaint ("SAC") for failure to state a claim upon which relief can be granted. Defendants contend that Plaintiffs' Section 1981 and Title VII claims fail to plead plausible

entitlement to relief. Defendants also move to dismiss the Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, and Eighteenth Causes of Action – all of the NYSHRL claims – for lack of subject matter jurisdiction. Defendants assert that Plaintiffs' NYSHRL claims should be dismissed because neither Plaintiff lived nor worked in the State of New York at all times relevant to this complaint.

  Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Background

####  A. The Parties

  At all relevant times, Plaintiff Meilus was a 30 year old female. (Compl. ¶ 5). Meilus was an employee of Defendant ROC. (Compl. ¶ 6). She served as the Mid-Atlantic Regional Director Program Manager – initially as a contract employee beginning in January 2019, and later as a full-time employee between February 1, 2019 and March 6, 2020. (*Id.*).

  At all relevant times, Plaintiff Taylor was a Black female. She was a skilled and zealous labor organizer. (Compl. ¶¶ 7, 37). Taylor was also an employee of Defendant ROC. (Compl. ¶ 8). She served as Lead Organizer from January 2018 until October 2019. (*Id.*).

  Defendant ROC is a New York non-for-profit corporation with headquarters located at 274 Seventh Avenue, New York, NY 10001. (Compl. ¶ 9). Its mission is to improve working conditions for low wage restaurant workers. ROC has chapter offices in various US cities, including Washington, D.C., Oakland, New Orleans, and Chicago. (*Id.*).

  At all relevant times, Defendant ROC was an "employer" of Plaintiffs, Defendant Siby, and Defendant Farris within the meaning of applicable statutes and New York state law. (Compl. ¶ 10).

At all relevant times, Defendant Siby was the Executive Director for Defendant ROC (Compl. ¶ 12), and Defendant Farris was ROC's Chief Operations Officer and Human Resources Director.  (Compl. ¶ 13).

*B.   The Allegations*

Plaintiffs allege that they were treated differently from other, similarly situated employees because of their age, gender, and race, before finally being terminated in retaliation for their complaints based thereon. (Compl. ¶¶ 18, 20–23, 26–36, 40–43, 45–49, 51–61, 63, 66–69).

Plaintiff Sigute Meilus

Meilus appeared satisfied and successful in her role as a Manager/Director for ROC in the first several months of her employ. (Compl. ¶ 15). Meilus had never been told of any negative work-related or performance-related issues with her job functions and her chapter was meeting required goals. (Compl. ¶ 31).

However, in the summer of 2019, Al Chavez ("Chavez") was assigned to supervise Meilus. (Compl. ¶ 17). Chavez is a male in his 50s. (*Id.*). Chavez's supervisor was Teo Reyes ("Reyes") and both Reyes and Chavez reported to Siby and Farris. (Compl. ¶¶ 24–25).

Chavez proceeded to harass Meilus, allegedly due to her age and gender. (*Id.*). Meilus was the only female on the management team, but Chavez trivialized that accomplishment. He routinely referred to her as "kid" – a word he also used to refer to other female staffers – as well as "entitled" and "bratty." (Compl. ¶ 18). Chavez also used gendered language, such as referencing being "somebody's bitch," stating that more "female energy" was needed, and remarking that "women know how to get shit done." He regularly disregarded various employees' preferred pronouns. (*Id.*).

Though Meilus, at the relevant time, had eight years of organizing experience and was in her fourth year in a managerial role, Chavez repeatedly berated her for being on the younger end of her cohort, despite the fact that her performance was commensurate with that of her older, male peers. (Compl. ¶ 19, 21). Chavez repeatedly asked about her age and made comments seemingly intended to suggest that she had no right to occupy her position, including, "you're only…years old," "you're so young," "you could be doing anything," and "why do you want to work here?" (Compl. ¶ 18, 20).

Chavez consistently cancelled supervisory check-ins with Meilus. Rather than speak to her directly, he passed pertinent information to her through the other Regional Directors, all of whom were older than she and were men. (Compl. ¶ 21). Chavez excluded Meilus from important meetings that were critical to her being able to perform her duties, though other male employees in lower ranked positions were invited to and did attend. (Compl. ¶ 22). Meilus was also not invited to participate in an organization-wide leadership retreat, despite the fact that a newly hired male Regional Director who had no relevant responsibilities was not similarly barred. (*Id.*).

Meilus was discouraged from making formal complaints to Human Resources ("HR"). (Compl. ¶ 34). Indeed, Chavez caused Meilus to believe that HR and other managers were biased against younger staff like herself. (*Id.*). Still, Meilus did complain about Chavez's behavior to ROC, after which he admitted to plotting to remove her from her job. (Compl ¶ 23). Reyes then tried to fire Meilus, citing the failure of Pennsylvania staff to meet certain metrics. (Compl ¶ 24). Melius alleges that this particular measure of performance had never before been viewed as warranting the termination of an employee. (*Id.*).

At a leadership meeting with Chavez and two then-Regional Directors, Meilus tried to broach the subject of gender pay inequity. (Compl. ¶ 26). Chavez referred to young women employees as "kid" throughout the conversation. (*Id.*).

During a subsequent discussion between Meilus and Siby about budgeting and long-term organization, Meilus raised the issue of her compensation. (Compl. ¶ 27). Meilus oversaw both the ROC DC and the ROC PA chapter budgets, but she had noticed that her salary was only included in the former's budget for the first time. (*Id.*). Meilus and Siby had a charged conversation about gender-based pay disparity at ROC and Meilus' treatment as a woman at the organization. (*Id.*). Despite her complaints, no corrective action was taken by Defendant ROC. (Compl. ¶ 36).

Three days after this conversation, on March 6, 2020, Reyes fired Meilus without notice, via email. (Compl. ¶ 28, 32). Farris approved and signed off on Meilus' termination. (Compl. ¶ 30). Meilus was not permitted to send final emails to colleagues or other contacts, or to close out any projects. (Compl. ¶ 32). She also did not receive any severance pay. Her treatment differed from that accorded David Palmer, a similarly situated male employee with the same management role, who was paid a higher salary than Meilus and who received severance pay upon his termination. (Compl. ¶ 33).

<u>Plaintiff Laura Ekau Taylor</u>

Taylor entered her position at ROC confident in the value of her extensive network of Black labor workers. (Compl. ¶ 37).

Taylor was the only staffer in the office of ROC's New Orleans chapter. She was required to oversee the organization of that new office and to assume the responsibilities of a Director with little in the way of resources or support. (Compl. ¶ 38). Taylor was given no access to grant money

or funding to further her chapter's purpose, despite the fact that certain funds were meant to be used for that purpose. (*Id.*).

ROC did use grant money funds to rent Taylor's office. (Compl. ¶ 43). However, the facility ROC allocated to Taylor for an office was a desolate and unkempt building. (Compl. ¶ 40). The space was filled with rodents, dead animals, mold and mildew, rotting equipment, broken glass and homeless squatters – a veritable health and safety violation. (*Id.*). Taylor was expected to pay for her own office door and to hire and "house" interns (which I assume means, provide them with office space). (Compl. ¶ 41).

When Taylor raised concerns about the office, ROC told her to "clean" as she worked, and later to work at a coffee shop. (*Id*; Compl. ¶ 46). After reporting a break-in to Farris, Taylor was instructed to board the shattered window with plywood and continue working. (Compl. ¶ 47). These same conditions were not faced by Taylor's white counterparts in offices located elsewhere. (Compl. ¶ 42).

Taylor remained steadfastly committed to providing greater opportunities for New Orleans' restaurant workers. (Compl ¶ 44). For her Black members, however, these opportunities did not come to fruition. (*Id.*). ROC refused Taylor necessary resources, forcing her frequently to dig into her own pockets to fund program initiatives and compensate vendors and members. (Compl ¶ 45, 48–49). ROC chapters that did not have Black majorities, such as that in Seattle, were not similarly underfunded by the organization. (Compl ¶ 44).

When ROC held a mandatory national convention of its members in New York, Taylor expended personal funds to allow her Black members to attend. (Compl. ¶¶ 51–52). ROC refused to offer any financial assistance for Black New Orleans members to get to the conference, even though those individuals earned no more than $200/week. (Compl. ¶ 51). But, ROC allegedly paid

for flights, accommodations, and catering for white members of the organization. (Compl. ¶ 52). ROC even handed out $20 bills to white attendees, but offered no such perk to Taylor's Black members. (*Id.*).

After the conference, Taylor complained to officials at ROC about the disparate treatment of her members, both generally and at the New York event specifically. (Compl. ¶ 54). Taylor accused ROC of being anti-black and exploiting her members for its own financial gain. (*Id.*).

Taylor's complaint apparently fell on deaf ears, as evidenced by her Black members' experience at ROC's next event, which was held a few months later in Washington, D.C. (Compl. ¶ 55). Black and white members were segregated into different rooms. White restaurant owners were afforded a $100,000 budget and served catered food, while Black members were again neglected. (*Id.*). Taylor complained about the Washington, D.C. event, just as she had about the New York event, to no avail. (Compl. ¶ 57).

As another (albeit non-mandatory) New York ROC event was approaching, Taylor prepared to present ROC leadership with a written submission detailing the mistreatment of Black ROC members, even as many of them refused to make the trip, for fear of history's repeating itself. (Compl. ¶ 58–59). The formal complaint letter prepared by Taylor and her colleagues also referred to racist incidents that were specific to her. (Compl. ¶ 59).

At the airport on her way to New York, Taylor was halted by TSA and so was unable to board her flight. (Compl. ¶ 58). Taylor notified both her supervisor and Defendant Farris of the situation. (*Id.*). Her letter was still delivered to ROC, with Plaintiff Taylor named as a contributor. (Compl. ¶ 59).

Soon after, in a text message, Taylor was informed of an upcoming disciplinary meeting for being a "no show no call," for some unspecified event – quite possibly, the New York event

she could not get to because of being unable to board her flight. (Compl. ¶ 61). The disciplinary meeting never took place. (*Id.*).

Several months later, in another text message, Taylor learned that her supervisor, Chavez, was in New Orleans for the first time to see the office. (*Id.*). Chavez fired Taylor on this trip, without notice and without any disciplinary meeting or hearing, in violation of her collective bargaining agreement. (*Id.*). Farris sent Taylor a letter of termination in which she accused Taylor of being a "no call, no show" at a mandatory ROC event in Washington, D.C. (Compl. ¶ 63).

Until her termination, Taylor was praised for her job performance. She was never subject to any disciplinary action. (Compl. ¶ 64). Taylor's white counterparts did not suffer as much as chastisement following an infraction like Taylor's. (Compl. ¶ 67). As compared to Taylor, white male organizer Eli Edleson-Stein, of the Twin cities chapter, was never condemned for requesting greater support. (*Id.*).

### C. Procedural History

Plaintiffs filed the complaint in the present action on March 26, 2021. (Dkt. No. 1). Plaintiffs then filed an Amended Complaint on August 9, 2021. (Dkt. No. 26–27). Plaintiffs' most recent Amended Complaint was filed on August 12, 2021. (Dkt. No. 29). This Second Amended Complaint (SAC) is the operative pleading.

On August 23, 2021, Defendants filed a notice and memorandum of law in support of a partial motion to dismiss Plaintiffs' SAC, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). (Dkt. No. 30–31).

## DISCUSSION

### I.   The Motion to Dismiss Plaintiffs' Federal Claims for Failure to State a Claim is DENIED

Melius brings claims for gender discrimination and retaliation against ROC (but not the individual defendants) under Title VII of the Civil Rights Act of 1964, as amended. §§ 42 U.S.C. 2000e *et seq*. Taylor does not bring any Title VII discrimination claims (presumably she failed to exhaust administrative remedies and so lost those claims) but she does bring a claim of racial discrimination in employment and retaliation under 42 U.S.C. § 1981, also against ROC.[1]

Defendants move to dismiss three of these four federal causes of action for failure to state a claim.[2] That aspect of their motion is DENIED in every respect.

#### A.   *Legal Standard*

To survive a motion to dismiss made pursuant to Federal Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Such facial plausibility requires plaintiffs to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a Complaint against this standard, the Court should begin by distinguishing factual allegations, which must be accepted as true at this stage, from "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which are "not entitled to the assumption of truth." *Id.* at 678–79. Where plaintiffs

---

[1] The court is unsure whether that is an error. While only employers, not managers or other individuals, cannot be sued pursuant to Title VII, they can be used pursuant to Section 1981. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000). However, the SAC quite specifically brings the Section 1981 claims only against ROC.

[2] Defendants do not move to dismiss Taylor's Section 1981 retaliation claim, only her race discrimination claim.

fail to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. It should be noted, however, that Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

Insofar as their federal claims are concerned, Plaintiffs' complaint satisfies this standard in every particular.

### B. Plaintiff Meilus Has Plausibly Alleged Gender as a Motivating Factor Sufficient to Sustain a Gender Discrimination Claim Under Title VII

The standard by which the viability of a claim of gender discrimination is judged is the familiar standard set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff must plausibly allege four things to survive a motion to dismiss: "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation . . . " *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015).

The complaint certainly alleges that Meilus is a member of a protected class (a woman) and that she was qualified for her position at ROC. So, we turn to whether she has plausibly pleaded that her employer took adverse action against her in circumstances tending to suggest that her gender was a motivating factor.

As to the third element – adverse employment action – "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment [including] termination of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d

636, 640 (2d Cir. 2000). Here, Plaintiff Meilus was fired. That is the most adverse employment action possible.

As to the fourth element, a plaintiff need only allege facts giving plausible support for "a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311. The Second Circuit has held that an amalgamation of indirect evidence of discrimination may be sufficient to meet this standard:

> It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: "the employer's [. . .] invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Leibowitz v. Cornell University*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). The Second Circuit has also advised that courts are to "be mindful of the elusive nature of intentional discrimination" because "clever men may easily conceal their motivations." *Vega*, 801 F.3d at 86.

Here, Defendants describe Plaintiff Meilus' gender discrimination claim as "conclusory," asserting that the SAC lacks "sufficient details as to the context in which [Defendants' alleged discriminatory] comments and actions took place . . . " (Dkt. No. 38). Plaintiff counters that "Ms. Meilus' allegations far exceed what is necessary to satisfy notice requirement at the pleading stage . . . " (Dkt. No. 37).

Plaintiff is correct. Frankly, her claims are anything but "conclusory." They are highly specific. Meilus alleges that, during the relevant time period, she was subjected to consistent harassment by her male supervisor, Chavez, who regularly referred to her and other female employees as "kid," entitled," and "bratty" and had a habit of using gendered language in the workplace. She alleges that male colleagues were apprised of important information and invited

to leadership meetings and a retreat, from which she was excluded. She alleges that ROC did not compensate similarly situated male and female employees equally, about which Meilus complained. And she alleges that a similarly situated male at Defendant ROC was separated with severance pay, while she was not. (Dkt. No. 29).

As in *Khanna v. MUFG Union Bank, N.A.*, which Plaintiff cites as persuasive, the facts alleged here "show the sort of 'mosaic' of intentional discrimination based on 'bits and pieces' of evidence that we expect to see in a discrimination claim . . ." *Khanna v. MUFG Union Bank, N.A.*, 785 Fed.Appx. 15, 16 (2d Cir. 2019). Here, as in *Khanna*, Meilus claims that she was treated less favorably than her male coworkers and that her supervisor spoke to her in a patronizing manner but was fraternal toward her male colleagues. *Id.* Though Meilus does not allege any facts about her replacement in the SAC, as the plaintiff did in *Khanna*, the Second Circuit has held that "plaintiff is not required to establish that she was replaced by a single male [. . .] to carry her burden." *Leibowitz v. Cornell University*, 584 F.3d 487, 503 (2d Cir. 2009). When viewed in the context of ROC and its employees' apparently tolerable sexism, the SAC more than meets Plaintiff's minimal burden at the pleading stage.

The motion to dismiss Count 3, Meilus' Title VII gender discrimination claim, is denied.

### C. *Plaintiff Meilus Has Plausibly Alleged a Retaliation Claim Under Title VII*

To sustain a claim of retaliation under Title VII "on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated – or took adverse employment action – against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90. At the motion to dismiss stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements [articulated in the previous sentence]

that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 315.

As to the first element, the Supreme Court has held that an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). This definition is broader than the definition of "adverse employment action" under the discrimination provision, which is limited to "actions that affect the terms of and conditions of employment." *Id.* at 64. That being so, the fact that Meilus' pleading meets the higher standard means that it automatically meets the lower standard of pleading an adverse employment action in connection with her retaliation claim. Besides, being fired is as adverse an action as one can plead.

Meilus pleads that she was fired three days after making a complaint about discrimination against women in ROC's workplace. That is sufficient to get her past a motion to dismiss.

Defendants argue that this temporal proximity – which falls well within the Second Circuit's five-month standard (though not a bright-line rule) for raising an inference of retaliation under *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 555 (2d Cir. 2001) – is insufficient to raise an inference of retaliation because Meilus was already on notice, before making her complaints, that her job was on a tenuous footing. That argument may resonate with a jury at trial – or not – but it does nothing to defeat the inference of retaliation at the motion to dismiss stage.

"The text, structure and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer. . . which is more demanding than the motivating-factor standard" that applies only to status-based discrimination. *University of Texas Southwestern*

*Medical Center*, 570 U.S. at 362. Binding decisions have held on numerous occasions that in order to adequately plead causation in a retaliation claim under title VII, a plaintiff's minimal burden is to plausibly allege but-for causation. *Vega*, 801 F.3d at 90–91; *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018); *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013). This Meilus has done simply by alleging that she was fired three days after complaining of discrimination, even though she had long been "on notice" that her supervisor was dissatisfied with her performance. ROC will have an opportunity to argue that the adverse action (termination) would have occurred even if Meilus had not complained about discrimination, see *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013) – but that will happen at trial, not now.

This Court finds entirely unpersuasive the two cases cites by Defendants for the proposition that a plaintiff who was already at risk of an adverse employment action cannot rely solely on temporal proximity in order to plead plausibly that retaliation was the cause of her dismissal. *See, e.g., Fukelman v. Delta Air Lines, Inc.*, 18-cv-2, 2020 U.S. Dist. LEXIS 66410, at *60–61 (E.D.N.Y. Apr. 13, 2020) and *Elliot-Leach v. New York City Dep't of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017). Nor do I believe that my colleague Judge Rakoff's decision in *Catanzaro v. City of New York*, 2011 WL 335648, at *7 (S.D.N.Y. Jan. 25, 2011), *aff'd*, 486 F.App'x 899 (2d Cir. 2012) compels dismissal of Meilus' retaliation claim. Judge Rakoff held that, "where a plaintiff is 'demonstrably at risk' of the adverse action in advance of the protected activity, he 'cannot show on the basis of temporal proximity *alone* that the adverse action resulted from that conduct.'" Emphasis added. Here the complaint alleges that a rather lengthy period of time passed between the actions that allegedly put Meilus – a stellar employee with no performance or work-related issues documented in her filed (Compl. ¶ 31) -- on notice that her job standing was

precarious and the date she was actually fired. Coincidentally, however, she was fired three days after she made a formal complaint about gender discrimination to Siby. If those facts are proved at trial, the inference that it was her complaints that finally pushed her employer to end her employment – making retaliation the but for cause of her dismissal – will be compelling indeed.

The motion to dismiss Count 4, Meilus' federal retaliation claim, for failure to state a claim is denied.

*D. Plaintiff Taylor Has Plausibly Alleged But-For Causation Sufficient to Sustain a Discrimination Claim Under Section 1981*

Taylor brings no claims under Title VII. Instead, she relies on Section 1981 of the Civil Rights Act of 1866, which "permit[s] the prosecution of anyone who 'depriv[es]' a person of 'any right' protected by the substantive provisions of the Civil Rights Act of 1866 'on account of' that person's [. . .] 'color or race.'" *Comcast Corporation v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020) (quoting Act Apr. 9, 1866, ch. 31, § 2, 14 Stat. 27). She brings claims for both race discrimination in the workplace (Count 1) and retaliation (Count 2). Defendants, as noted above, move to dismiss the former but not the latter.

Section 1981 is meant to provide "relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). To prove a Section 1981 claim, "a plaintiff must allege facts that: 1) he is a member of a racial minority; 2) the defendants intended to discriminate on the basis of race; and 3) the discrimination concerned one or more of the activities enumerated in the statute including the making and enforcing of contracts." *Hussein v. Sheraton New York Hotel*, 100 F.Supp.2d 203, 206 (S.D.N.Y. June 1, 2000).

Taylor is irrefutably a member of a racial minority. She contends that ROC deprived her of her civil rights by discriminating against her, treating her differently than similarly situated white employees, and terminating her because of her race and her complaints about racism. (Compl. ¶ 71).

The Supreme Court has found that "textbook tort law" holding that "a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation" extends to federal antidiscrimination laws like § 1981. *Comcast Corporation v. National Association of African American-Owned Media*, 140 S.Ct. 1009 (2020). A plaintiff claiming relief under § 1981 must demonstrate that, but for her race, her alleged injury would not have occurred. *Id.* at 1013–14.

But for now, Taylor need not demonstrate anything. All she has to do is plausibly allege that she was discriminated against at work on the basis of her race. This she has done. She alleges that: Defendants afforded white members and colleagues satisfactory working conditions and resources, but failed to do so for her; Defendants refused to offer black members financial assistance for attendance at events, while supplementing costs for white members and offering them nicer accommodations and perquisites; Defendants required her to pay out of her own pocket for work-related expenses for black members and projects intended to better the situation of black members, but did not similarly require white employees to make such out of pocket expenditures; Defendants refused to support her initiatives for black members; and Defendants terminated her for missing a non-mandatory meeting, but did not do so for a similarly situated white employee who committed an equally small infraction. (Dkt. No. 29); *See also* Dkt. No. 37. These allegations are enough to sustain Taylor's discrimination claim under Section 1981 at the motion to dismiss stage.

It is true that much of what Taylor alleges speaks more to "the mistreatment of her black members," than to the mistreatment of Taylor, herself. Also, allegations of "anti-blackness" without allegations of adverse actions against Taylor herself would be insufficient to sustain her claims. However, the SAC is not marred by conclusory allegations, but rather enumerates a series of behaviors by Defendants that plausibly suggests Taylor was discriminated against on the basis of her race.

In *Rubert v. King*, 2020 WL 5751513, at *7 (S.D.N.Y. Sep. 25, 2020) (quoting *Lopes v. Westchester County*, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020)),  my colleague Judge Karas held that where the plaintiff "simply (and conclusorily) allege[d] that he was 'fired because defendants saw him as another expendable Hispanic,' and that '[his employer] ha[d] a history of discrimination and illegal conduct,'" his "boilerplate assertion[s]" would not suffice. But the SAC is far from that obviously defective pleading. It contains allegations suggesting that Taylor was discriminated against throughout the course of her employment, and that she was fired "under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). Taylor was made to work in inhospitable conditions and refused aid, whereas "In the Twin cities chapter, white male organizer – Eli Edleson-Stein received greater support for his white membership and never experienced any retaliation when he complained or requested greater support." (Compl. ¶ 67). Taylor was also among the class of people (Black) for whom there was no budgetary support at organization-wide events in New York and Washington, D.C., while white members did receive support. . (Compl. ¶ 51–52, 55). "In addition, these white counterparts were not terminated or even disciplined for the superficial, minor trumped up incident that she was fired for." (Compl ¶ 67).  I doubt very much that Judge Karas would have viewed Taylor's complaint in the same way he viewed Rubert's.

For these reasons, the motion to dismiss Count I, alleging discrimination in employment and termination on the basis of race pursuant to Section 1981, is denied.

## II.   All of Plaintiffs' Claims Under the New York State Human Rights Law Are Dismissed

### A.   Legal Standard

The rest of the claims asserted by the plaintiffs – some fourteen in all – arise under the New York State Human Rights Law, N.Y. Exec. L. § 296, et seq. That law provides:

> It shall be unlawful discriminatory practice: (a) For an employer [. . .] because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, [or] sex [. . .] to [. . .] discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

The NYSHRL was written with the understanding that:

> [T]he state has the responsibility to assure that every individual within [New York] is afforded an equal opportunity to enjoy a full and productive life and [. . .] failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care [. . .] threatens the rights and proper privileges of its inhabitants . . .

It was described by the legislature as an "exercise of the police power of the state for the protection of the public welfare, health and peace *of the people of [New York]*." *Id.* In some ways, the NYSHRL "affords protections unavailable under federal law to discrimination plaintiffs." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017). And therein lies the rub. The NYSHRL does not protect persons who do not reside in or work in New York State, even if they are employed by a New York corporation. *Ware v. L-3 Vertex Aerospace, LLC*, 833 Fed.Appx. 357 (2d Cir. 2020); *See also Hoffman v. Parade Publ'ns.*, 15 N.Y.3d 285, 290, 933 N.E.2d 744, 747 (N.Y. 2010). Although Section 298-a of the NYSHRL establishes protection under the Law from acts "committed outside [New York] against a *resident* of [New York] . . . if such act would constitute an unlawful discriminatory practice if committed within [New York]," it does not apply

to acts committed against *non-residents*. NY EXEC § 298-a (emphasis added). "The NYSHRL does not provide a *non-resident* with a private cause of action for discriminatory conduct committed *outside* of New York [even] by a *New York* corporation." *Beckett v. Prudential Ins. Co. of America*, 893 F. Supp. 234, 238 (S.D.N.Y. May 11, 1995).

Defendants move to dismiss all claims asserted under the NYSHRL, on the ground that the two named Plaintiffs are not New York residents and did not work in New York. Defendants rely on *Hoffman v. Parade Publ'ns.*, 15 N.Y.3d 285, 933 N.E.2d 744 (N.Y. 2010) for the proposition that the NYSHRL does not extends protection to persons who lived and worked outside of New York at the relevant time. *Hoffman*, 15 N.Y.3d at 291–292. In *Hoffman*, the New York Court of Appeals of New York wrote, "The obvious intent of the State Human Rights Law is to protect 'inhabitants' and persons 'within' the state." *Hoffman*, 15 N.Y.3d at 291.

However, the "impact requirement" makes clear that not all nonresidents are excluded from the protection of the NYSHRL; "rather, it expands those protections to nonresidents who work in the [state], while concomitantly narrowing the class of nonresident plaintiffs who may invoke its protection." *Hoffman*, 15 N.Y.3d at 290. Thus, the Court concluded that "a nonresident must plead and prove that the alleged discriminatory conduct had an impact in New York" in order to invoke the protection of the NYSHRL. *Id*; *See also E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816, 865 (S.D.N.Y. Sep. 9, 2013). In imposing this requirement, the NYSHRL "achieves the same ends as is the case with its City counterpart" – i.e., predictability and administrability. *Hoffman*, 15 N.Y.3d at 291.

To satisfy the impact requirement, something more than "a tangential connection" to New York State is required. *Hoffman*, 15 N.Y.3d at 292. Further, "simply [. . .] pointing to frequent communication with a managing office in New York City and meetings there regarding local

projects" is insufficient. *E.E.O.C.*, 967 F.Supp.2d at 865 (citing *Fried v. LVI Services, Inc.*, 2012 WL 4856403 (2d Cir. 2012)). The "impact of the discriminatory act" must be felt inside New York State. *Hoffman*, 15 N.Y.3d at 292. For example, if the complaint alleges that out-of-state discriminatory conduct "affected the terms and conditions of plaintiff's employment within [New York]," the impact requirement is satisfied. *Anderson v. HotelsAB, LLC*, 2015 WL 5008771 (S.D.N.Y. Aug. 24, 2015).

Plaintiffs do not deny Defendants' contention that they neither lived nor worked in New York – they do not claim to be residents of New York. Instead, they argue that the acts of discrimination about which they complain took place in New York, such that the impact requirement is satisfied. And indeed, the SAC and moving papers contain a number of allegations about Plaintiffs' contacts with the State of New York.

Meilus, in her capacity as a Manager/Director, is alleged to have been in regular communication with staff and supervisors employed by ROC including her supervisor, Chavez, all of whom were based in New York. (Compl. ¶ 16). Meilus allegedly was required to travel regularly to New York for staff meetings and planned events, for her assigned work on the National One Fair Wage Work program, and for routine meetings with Chavez. (*Id*; Compl. ¶ 17). The SAC also alleges that, while Meilus was responsible for managing staff including those stationed in Pennsylvania and Massachusetts, her presence was with ROC's New York chapter. (Compl. ¶ 16).

Taylor, in her capacity as Lead Organizer, is alleged to have been in regular communication with staff and supervisors employed by Defendant ROC, those of whom were based in New York. (Compl. ¶ 39). Like Meilus, Taylor was allegedly required to travel regularly to New York for meetings and planned events, including the two national events that are the centerpiece of her

allegation that ROC treated its Black members differently from its white members.  (*Id*; Compl. ¶¶ 51, 58).

Unfortunately for Plaintiffs, these are precisely the type of "contacts" that confer insufficient "impact" to bring them within the purview of the NYSHRL. The issue in evaluating whether or not to dismiss these NYSHRL claims is not whether Plaintiffs' claims "stem from" New York-based discriminatory conduct, but whether the impact of the contested employment action was *felt by Plaintiffs in* New York. *Vangas v. Montefiore Medical Center*, 823 F.3d 174, 183 (2d Cir. 2016); *See also Hoffman*, 15 N.Y.3d at 292. The Second Circuit has specifically concluded that the impact test does not extend the reach of the NYSHRL to out-of-state employees whose only contacts with the State are communications with people in New York, as such "would broaden the statute impermissibly." *Vangas*, 823 F.3d at 183; *See also Kraiem v. JonesTrading Institutional Services LLC*, 492 F.Supp.3d 184, 199 (S.D.N.Y. Sep. 30, 2020).

Though the SAC contains allegations which mention Plaintiff Meilus' travels to New York and attendance at events in New York – travels and events at which some of the allegedly discriminatory acts occurred – the impact on Meilus was ultimately at her duty station, which is not in New York. Certainly, the impact of her termination – whether based on gender or age discrimination or on retaliation – was felt in Washington D.C., not in New York. Further, in *Hoffman*, the Court of Appeals of New York held that a plaintiff who "attended quarterly meetings in New York City" had not met the impact requirement. *Hoffman*, 15 N.Y.3d at 288. This Court *has* found that "To the degree incidents of harassment or retaliation occurred while [plaintiff] was in New York City, the Court sees no reason those claims cannot proceed. At that time she was 'within the state' and among 'those who work in the city'." *Kraiem*, 492 F.Supp.3d at 200 (quoting

*Hoffman*, 15 N.Y.3d at 291)). However, the SAC does not make clear whether any of the incidents on which Meilus bases her claims took place while she was in New York.

Concerning Plaintiff Taylor, the impact test is not satisfied "simply by pointing to frequent communication" with staff and supervisors based in New York. *E.E.O.C v. Bloomberg L.P.*, *supra*, 967 F.Supp.2d at 865. The SAC does include allegations about two meetings – a mandatory national convention and a non-mandatory New York ROC event – at which discriminatory acts allegedly occurred, but impact is not measured by where the discriminatory acts took place. Taylor never attended the latter of these events, so she could have felt no "impact" in New York as a result of whatever discrimination may have occurred there. As to the former, the allegations about what occurred at the national convention involve general attitudinal discrimination toward African Americans, but do not include any discriminatory actions specifically directed toward Taylor herself, as opposed to her "members." (Dkt. No. 37). The pleading chronicles in great detail the failure of ROC to support her mission in New Orleans; to provide her with a suitable office in New Orleans; to fund travel from New Orleans; to compensate her vendors in New Orleans; or ultimately to create greater opportunities for her Black membership in New Orleans. New Orleans is the locus of Taylor's job-related activities; it is where she felt the impact of discrimination, whether that discrimination was perpetrated in New York or elsewhere

Attached to Defendants' motion papers are certain documents showing that Meilus' mailing address at all relevant times was in Washington D.C. and Taylor's was in New Orleans. Plaintiffs have not argued that these employment documents should not be considered in connection with this motion; indeed, they are more or less incorporated into the factual allegations of the SAC, which specifically alleges that Meilus lived and worked in Washington D.C. and Taylor lived and worked in New Orleans, and that they came to New York or communicated with

New York from time to time.[3] They are not New Yorkers. The NYSHRL does not extend to their employment – even though ROC is a New York-based enterprise.

## CONCLUSION

For the reasons discussed above, Defendant's partial motion to dismiss is GRANTED as to all claims asserted by Plaintiffs under the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. As to the First, Third, and Fourth Causes of Action in Plaintiffs' Amended Complaint, Defendants' partial motion to dismiss is DENIED.

The Clerk of Court is respectfully directed to remove the motion at Docket Number 30 from the Court's list of open motions.

Dated: October 15, 2021

_____

United States District Judge

BY ECF TO ALL COUNSEL

---

[3] Defendants anticipated that Plaintiffs would object to the consideration of these documents, but Plaintiffs did not so object. (Dkt. 31, 37)